THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v TYRONE FARMER, Appellant.

First Department, December 2, 1982

**APPEARANCES OF COUNSEL**

*Henriette Hoffman* of counsel (*Lissa Griffin* with her on the brief; *William E. Hellerstein,* attorney), for appellant.

*Amyjane Rettew* of counsel (*Robert M. Pitler* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

**OPINION OF THE COURT**

MILONAS, J.

The defendant, Tyrone Farmer, appeals from a judgment of the Supreme Court, New York County, entered on March 14, 1979, convicting him, following a jury trial, of murder in the second degree and sentencing him to a term of imprisonment of from 25 years to life.

At trial, the People's principal witness was George Baldwin, who stated that he had become acquainted with Farmer when the latter started dating Baldwin's sister. Early in the summer of 1977, the defendant moved into the

Baldwin apartment and began living there with Baldwin and Baldwin's mother. Several days prior to July 2, 1977, the date of the murder, the defendant showed Baldwin a .22 caliber pistol, explaining that he had obtained it from his mother's boyfriend. (Although Baldwin initially claimed that the defendant had exhibited the gun to him a month or so earlier, on cross-examination he recalled first seeing the weapon two days before the murder. Francis Clayton Bowlding, a security guard living with the defendant's mother, testified that he had discovered his .22 caliber pistol missing sometime shortly before July 2, 1977.) The gun had only two or three bullets in it, and Baldwin offered to provide Farmer with five additional bullets that he had collected as "souvenirs".

On the day of the incident, Baldwin encountered the defendant standing on a street corner with a group of people. He approached Farmer and requested to borrow some money in order to take a date to the movies that evening. The defendant, however, declined to extend the loan. After conversing with the defendant for approximately 25 minutes, Baldwin asked Farmer to watch his bicycle while he stopped by at a nearby grocery store for a soda. Inside the store were Abraham Myers, 78 years old, and his wife, 67-year-old Rachel Myers. Baldwin walked up to the counter and ordered a soda. While he waited, the defendant entered, pulled out a gun and leaped on top of the counter near the cash register. When Mrs. Myers resisted Farmer's attempt to open the cash register, the defendant shot and killed her. Mr. Myers, who had been in the back of the store, rushed to the front in response to his wife's screams. The defendant shot twice at him, missed, and then fled outside. Baldwin repeatedly denied any knowledge of, or participation in, the attempted robbery.

The prosecution also called three neighborhood women as witnesses, all of whom were about to go into the store at around the time of the shooting. As they arrived at the front door, Hattie Garnett glanced through the window and observed the defendant on the counter with a gun in his hand. In the middle of the room was another man whom she did not recognize. She instructed her friends to inform the police and then ran back to her house. Rosalyn Brown

also testified to having seen the defendant on the counter, as well as an unknown man standing in the middle of the store. She too hurried away from the scene. However, unlike her friends, Arlene Washington did not immediately depart, but remained on the spot for a few moments, looking inside. She noticed one man on the counter and another in the middle of the store, but did not recognize either one "for sure". As she watched, the man on the counter reached down toward the cash register, stood up and, after stuffing something in his pocket, jumped down. In addition, Abraham Myers observed a man descend from the counter but was unable to identify him.

Baldwin had left the store before Farmer. Arlene Washington and her friends, the latter having returned to the area, noticed Baldwin's exit. A few seconds later, the defendant came out and headed in the same direction as Baldwin. According to Baldwin, as he was retrieving his bicycle, Farmer caught up to him and complained that Baldwin had done "wrong" to walk away from him and said, "the old man got away from me". Baldwin got on his bicycle, and riding away, noted that the defendant entered a building across the street. He encountered Farmer again later that night in the Baldwin apartment. The defendant asserted that he had not taken anything from the store after the shooting. A few days subsequent to this, Baldwin and the defendant rode their bicycles up to Farmer's mother's apartment in The Bronx, and the defendant brought the pistol back to Francis Bowlding. Although the gun was later recovered by the police, the bullet found in Mrs. Myers' body was too deformed for the ballistics expert to ascertain whether the bullet had been shot from that particular .22 caliber gun. However, the police were able to determine that the pistol was operable and bore evidence of having been discharged.

The defense called Detective Eugene Heghmann, who testified that he had been in charge of the investigation since the night of the murder. He declared that the forensic unit summoned to the scene were unable to discover any bullets in the store other than the one found in Mrs. Myers' body. He further stated that when he first interviewed Rosalyn Brown, she claimed that the only thing she had

observed was two men leaving the store. Farmer's mother also took the stand in her son's behalf. She asserted that until she moved to The Bronx, she and the defendant had lived in the same Manhattan apartment building as Mr. and Mrs. Myers and that Mr. Myers was acquainted with her son.

Following the People's direct case and during the defense presentation, the court inquired whether the defendant's attorney wished the jury to be charged on the question of Baldwin's possible complicity in the crime. The defense counsel indicated that he did, and the court declared that it would submit to the jury the matter of Baldwin's status as an accomplice. However, the District Attorney, after discussions between the parties, later announced that the prosecution and defense had reached an agreement that:

"on the understanding that there would not be a request for the jury to be charged on accomplice testimony, I have an application to amend the indictment under the murder count to delete from the indictment surplusage dealing with another person since that isn't a required element of the crime to begin with and need never have been put on the indictment and certainly since the jury is not going to be charged on accomplice testimony that it is not necessary.

"My application would be that the first count read after, 'Committed as follows:'

" 'The defendant in the County of New York on or about July 2nd, 1977, while engaged in the commission of attempted robbery and in the course of such crime and in the furtherance therefrom, the defendant caused the death of Rachel Myers, not a participant in the crime, by shooting her in the chest.' "

The court, having been informed that the defense did not object, granted the People's motion to strike from the felony murder count of the indictment those words relating to other participants. On summation, the defendant's lawyer argued that the testimony of Brown, Garnett and Washington was unreliable and that Baldwin, an admitted perjurer (apparently because he conceded having lied to the Grand Jury during his first appearance before it in

August of 1977, although he returned to the Grand Jury in October and, at that time, related the same account as he did at trial), was the only real witness to the crime. It was the defense's position that Baldwin actually fired the shot and that Farmer would never have committed such a deed knowing that Myers could identify him. According to the prosecution, on the other hand, George Baldwin's testimony was truthful and fully corroborated by other witnesses and testimony.

In its instructions to the jury, the court charged felony murder on the theory that the defendant had acted alone. However, shortly after the deliberations had commenced, the jury sent in a note asking: "Can the defendant be guilty of count number one or two without having fired the shot that killed Mrs. Myers if he participated in the robbery?"

The defense counsel contended that the jury should be advised that the defendant could not be convicted of either felony murder or intentional murder unless the evidence established that he had fired the shot that killed Mrs. Myers. The court explained that its ruling would be apparent from its instructions, then proceeded to inform the jury that it could not convict the defendant of intentional murder unless it decided that he had in fact fired the gun. As to the felony murder count, the court charged that:

"A person is guilty of felony murder when acting either alone or with one or more other persons he attempts to commit a robbery and in the course of and in furtherance of such crime or of immediate flight therefrom either he or another participant, if there be any, causes the death of a person other than one of the participants * * *

"So that, if during the course of an attempted robbery, if there are two people, and if they are working together, or either one of them should cause the death of the victim then they would both be guilty of felony murder."

Immediately thereafter, the jury submitted a second note inquiring if such a determination could be made in this case "since it does not follow the exact argument of either the prosecution or the defense". The court responded by stating that the jury was bound by the evidence and the instructions on the law and that it could accept or reject the

logic of the summations, so long as its finding was based upon the evidence. The jury eventually returned a verdict of guilty on the felony murder charge, and the other counts were dismissed.

There seems to be no challenge to the content or wording of the instructions. Further, the defendant does not contend that the charge on joint liability would have been improper if delivered in conjunction with the court's other instructions to the jury. What the defense does object to is the lack of notice involved in the court's insertion of the joint liability issue after the summations had been concluded, thereby purportedly changing the theory of the case and permitting the jury to convict the defendant upon Baldwin's uncorroborated accomplice testimony. This, he alleges, deprived him of due process of law and his right to an effective summation.

First, it should be stated that the evidence against the defendant was strong and convincing. Two eyewitnesses, Garnett and Brown, identified Farmer as the man standing on the grocery storecounter. Brown, in fact, was acquainted with the defendant from the neighborhood and had spoken to him prior to the incident. Both Garnett and Myers observed the gun in his hand. The medical examiner's testimony regarding the trajectory of the bullet demonstrated that the deceased had been shot from above. Some time shortly before July 2, 1977, a .22 caliber pistol belonging to Francis Bowlding was removed from the home which he shared with the defendant's mother; the weapon was returned several days after the crime. When examined by the police, the gun bore evidence of having been fired. None of the other witnesses contradicted any aspect of Baldwin's version of what had occurred on the day of the shooting; quite the contrary, they corroborated it. Moreover, except for Baldwin's presence on the scene and his prior relationship to the defendant, there was no proof that Baldwin was a participant in the crime. Garnett, Brown, Washington and Myers all saw one man standing on the counter and another one in the middle of the store. This was consistent with Baldwin's narration. No one claimed that Baldwin took any action, or made any statements, such as would connect him to the commission of the at-

tempted robbery and the attendant murder. Thus, the hypothesis that Baldwin, rather than Farmer, was the perpetrator of the crime was based solely upon defense counsel's unfounded speculation to that effect in his summation. In view of the facts of this case, the jury was clearly warranted in its finding of guilt.

It is in this context that the defendant's argument that the court's supplemental charge abridged his right to due process and to an effective summation must be considered. In support of his position, the defense has cited a series of cases in which the defendants therein were held to have been deprived of an effective summation. (*People v Negron*, 70 AD2d 939; *People v Richards*, 67 AD2d 893; *People v Valerio*, 64 AD2d 516; *People v Skinner*, 57 AD2d 785.) However, unlike the instant matter, both *People v Negron* (*supra*) and *People v Richards* (*supra*) concerned situations in which the court initially refused to submit charges requested by the defense and then subsequently reversed itself. *People v Valerio* (*supra*) and *People v Skinner* (*supra*) were decided upon the particular facts pertaining to those cases and, thus, provide only limited guidance in those instances in which, as here, the circumstances differ. In *People v Skinner* (57 AD2d, at p 786) the court, in referring to the proof therein, stated that it "was not so suggestive of guilt that a defense summation, given with full knowledge of the precise charges to be submitted, might not reasonably have altered the verdict."

Whether a defendant has been deprived of the right to an effective summation, therefore, depends upon the peculiar facts of the case at issue. Here, the court, in reply to the jury's inquiry, provided what, in effect, amounted to no more than the statutory definition. Given the facts of this case, the conclusion is unavoidable that the defendant was not thereby prejudiced. Throughout the trial, the defense rested upon the contention that Farmer was not guilty because, as the defendant's counsel concluded during summation, "George Baldwin went into that store on his own, George Baldwin tried to get money from the register and Tyrone Farmer came in some time thereafter, after George Baldwin tried to get money and George Baldwin shot and killed Rachel Myers."

Although the jury was not persuaded by this argument, it appears to have been the only viable defense that Farmer could offer. Even assuming that based upon a reasonable view of the evidence, the jury could have found that Farmer acted in concert with Baldwin, and that the court had charged accordingly at the outset, the defendant's attorney would still have had to endeavor to convince the jury that his client was innocent because Baldwin was the guilty party. Considering the nature of the proof against him, it is fatuous to suppose that the defendant's summation might have been significantly different had he been given advance notice of the supplemental charge. As the court declared in *People v Vicaretti* (54 AD2d 236, at p 250): "To assume, as defendant contends, that the entire theory of the defense and, therefore, of defendant's summation would have been altered had he known of the intended charge * * * is specious and we conclude under the facts of this case, that the failure to so inform him did not result in a denial of his right to an effective summation." The other allegations advanced by the defendant are equally without merit.

Accordingly, the judgment of the Supreme Court, New York County (M. EVANS, J.), entered on March 14, 1979, convicting defendant, after a jury trial, of murder in the second degree and sentencing him to a term of imprisonment of from 25 years to life, should be affirmed.

KUPFERMAN, J. P., SANDLER and CARRO, JJ., concur.

Judgment, Supreme Court, New York County, rendered on March 14, 1979, unanimously affirmed.